358IN THE SUPREME COURT OF NORTH CAROLINA

 2021-NCSC-69

 No. 421PA19

 Filed 11 June 2021

 STATE OF NORTH CAROLINA

 v.
 THOMAS ALLEN CHEEKS

 Appeal pursuant to N.C.G.S. § 7A-31(c) from the decision of a unanimous panel

 of the Court of Appeals, 267 N.C. App. 579 (2019), finding no error in a judgment

 entered on 1 November 2017 by Judge Hugh B. Lewis in Superior Court, Gaston

 County. Heard in the Supreme Court on 22 March 2021.

 Joshua H. Stein, Attorney General, by Kimberly N. Callahan, Assistant
 Attorney General, for the State-appellee.

 Glenn Gerding, Appellate Defender, by Daniel Shatz, Assistant Appellate
 Defender, for Defendant-appellant.

 ERVIN, Justice.

¶1 The issues before us in this case arise from challenges lodged by defendant

 Thomas Allen Cheeks to a judgment entered by the trial court based upon defendant’s

 convictions for first-degree murder by starvation and negligent child abuse inflicting

 serious bodily injury. After careful consideration of defendant’s challenges to the trial

 court’s judgment, we affirm the Court of Appeals’ decision.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

¶2 Malachi Golden was born on 15 November 2010 in Gaston County. His mother,

 Tiffany Cheeks1, was nineteen years old at the time of Malachi’s birth and lived with

 her grandmother in Charlotte at that time. The child’s father, William Golden, was

 not present for Malachi’s birth and was never involved in his son’s life.

¶3 When Malachi was four months old, Ms. Cheeks noticed that the child was

 experiencing spasms during which “his head would fall and drop.” In January 2012,

 after discussing these occurrences with the child’s primary care physician, Ms.

 Cheeks took Malachi to see a pediatric neurologist named Stephanie Robinett. After

 performing a number of tests, Dr. Robinett prescribed Malachi an anti-seizure

 medication called Zonisamide, which proved itself to be effective in improving his

 spasms.

¶4 In June 2012, Malachi and Ms. Cheeks moved to Gaston County. Shortly

 thereafter, Ms. Cheeks met defendant and entered into a romantic relationship with

 him. In July 2012, defendant moved into the apartment that Ms. Cheeks occupied

 with Malachi. Ms. Cheeks and defendant had two children together, one of whom

 was born in May 2013 and the other of whom was born in November 2014, and

 married in November 2013.

¶5 Malachi continued to see physicians throughout 2012. In September 2012,

 Malachi underwent a series of tests at the University of North Carolina at Chapel

 1 We will utilize Malachi’s mother’s married name throughout this opinion in the
 interest of consistency.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 Hill. In the course of the testing process, treating physicians discovered that Malachi

 suffered from a genetic abnormality that consisted of an inverted 12 chromosome and

 a minor deletion of his 22 chromosome. After learning about Malachi’s chromosomal

 abnormality, Ms. Cheeks authorized further treatment for her son. Ms. Cheeks did

 not, however, bring Malachi back to Chapel Hill so that he could receive such

 treatment.

¶6 From December 2012 until November 2013, Malachi received occupational and

 physical therapy as the result of referrals made by the Child Development Service

 Agency. Upon turning three years old in November 2013, Malachi aged out of the

 programs operated through the Child Development Service Agency and began to

 receive treatment from the Gaston County school system. In December 2014,

 however, Ms. Cheeks discontinued this treatment.

¶7 Shelly Kratt, one of the therapists assigned to provide services for Malachi

 through the Child Development Services Agency, conducted home visits at the

 Cheeks residence from April through November 2013. Ms. Kratt described Malachi

 as a “beautiful child” with “dark olive skin” and “dark beautiful eyes.” In the

 aftermath of the treatment that he received from Ms. Kratt, Malachi’s motor skills

 improved, permitting him to begin to walk and feed himself. Unfortunately, however,

 Ms. Kratt was frequently unable to conduct scheduled therapy sessions with Malachi

 because Ms. Cheeks would either cancel the session or refrain from answering the

 door when Ms. Kratt arrived. On the occasions when she was able to enter the home
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 and provide therapy for Malachi, Ms. Kratt observed that the Cheeks residence was

 “really dirty and messy” and “smelled really bad.” According to Ms. Kratt, Malachi

 was always alone in a “Pack N’ Play” playpen in a separate area of the home at the

 time of her arrival. Ms. Kratt noticed that, instead of participating in Malachi’s

 therapy sessions, defendant would occupy himself by playing video games.

¶8 Susan Matznik provided occupational therapy to Malachi from December 2012

 through October 2013 as the result of referrals from the Child Services Development

 Agency, with these therapy sessions having originally occurred at the Cheeks

 residence before being transferred to a clinic in Lincoln County. As had been the case

 with Ms. Kratt, Ms. Matznik had difficulty assessing and treating Malachi in light of

 the trouble that she experienced in getting an adult to answer the door at the Cheeks

 residence. Similarly, Ms. Matznik observed that the apartment was “dirty” and

 “smelled” and that Malachi was invariably alone in his playpen at the time of her

 arrival. According to Ms. Matznik, Malachi gained weight during the course of the

 therapy that she provided. On the other hand, Ms. Matznik remembered conducting

 a home visit at a time when defendant was the only adult in the residence in which

 she found Malachi “soaked with urine.” Although Ms. Matznik attempted to change

 Malachi, she had to use paper towels to clean the child given defendant’s inability to

 locate any baby wipes.

¶9 At the end of 2013, Malachi began participating in treatment sessions provided

 by Erica Reynolds, a pre-K itinerant teacher employed by the Gaston County public
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 school system. Ms. Reynolds described Malachi as having “big brown eyes, little

 chubby cheeks, [and] curly brown hair.” Malachi missed several appointments with

 Ms. Reynolds as a result of Ms. Cheeks’ failure to come to scheduled appointments

 without having sufficient reason for her non-attendance. During the one-year course

 of treatment that she provided for Malachi, Ms. Reynolds noticed that Malachi’s

 ability to walk had improved, with the child having gone from “taking maybe one or

 two steps to being able to walk the length of the hallway at the elementary.” On the

 other hand, Ms. Reynolds observed that Malachi appeared hungry during her visits,

 consistently “shovel[ing ] food in his mouth and gulp[ing ] his food down.”

¶ 10 Linda Hutchins, who provided physical therapy for Malachi during the

 summer of 2013, remembered that Malachi appeared to be adequately nourished

 when she began treating the child. Ms. Hutchins discharged Malachi from treatment

 at some point during 2013 for attendance-related reasons. In 2014, Ms. Cheeks

 stopped administering Zonisamide to Malachi. The last treatment of any type that

 Malachi received was provided by Ms. Reynolds in December of 2014.

¶ 11 In spite of the fact that she was no longer treating Malachi, Ms. Hutchins

 returned to the Cheeks residence during January and February 2015 for the purpose

 of providing services to one of Malachi’s younger siblings. At the time of one such

 visit in January of 2015, Ms. Hutchins observed that Malachi appeared to be “very

 thin.” Upon being asked if Malachi was under a doctor’s care, Ms. Cheeks responded

 that a physician had been seeing Malachi and that Malachi’s needs were being
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 addressed even though Malachi had not been seen by a medical doctor since 31

 October 2013.

¶ 12 On 22 January 2015, Ms. Hutchins and Michelle Hartman, a case coordinator

 with the Child Development Services Agency, came to the Cheeks residence for a

 visit. On that occasion, Ms. Hutchins observed that both Malachi and his younger

 sibling were hungry. However, while defendant fed Malachi’s sibling, Ms. Hartman

 had to take care of feeding Malachi. Similarly, upon arriving at the Cheeks residence

 on 5 February 2015, Ms. Hutchins observed that Malachi and his younger sibling

 were hungry and that, while the younger sibling received food, no one gave Malachi

 anything to eat. No one from outside the Cheeks household ever saw Malachi alive

 after that date.

¶ 13 On 11 May 2015, Ms. Cheeks was away from the residence and at work for

 most of the day, having left Malachi in the care of defendant, who served as Malachi’s

 primary caregiver during Ms. Cheeks’ absences. Upon returning home that night,

 Ms. Cheeks discovered that Malachi was “not breathing and [was] blue.” After calling

 911 for help, Ms. Cheeks asked defendant to help attempt to resuscitate Malachi, a

 request with which defendant refused to comply.

¶ 14 Upon their arrival at the Cheeks residence, emergency medical technicians

 found Malachi’s body lying on the floor in a bedroom. According to Travis Gilman,

 who was one of the emergency medical technicians dispatched to the Cheeks
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 residence, Malachi was “cold to the touch and . . . stiff.” As a result, Mr. Gilman

 pronounced Malachi dead on the scene.

¶ 15 Jennifer Elrod, another emergency medical technician who came to the Cheeks

 residence in response to Ms. Cheeks’ call, observed that Malachi’s “facial features

 were very sunken,” “his eyes were extremely sunken,” “you could see every bone on

 his body,” “you could count every rib in his rib cage,” “his stomach was very sunken,”

 and “there was no fat on his body.” In addition, Ms. Elrod stated that Malachi’s skin

 was gray, that his arms were “very skinny and very stiff,” that Malachi’s body was

 propped up on a pillow, and that there was “nothing” in the room other than a playpen

 and a highchair, with there being “no toys, nothing, it was just a very sparse room.”

¶ 16 Upon his arrival at the Cheeks residence shortly after the arrival of the

 emergency medical technicians, Officer Justin Kirkland with the Gaston County

 Police Department observed that the kitchen was stocked with food items and found

 a bottle containing a thirty-day supply of Malachi’s seizure medication, in which all

 thirty pills were still present, dated 24 July 2013. In addition, Officer Kirkland

 observed the presence of several flat screen televisions and video game consoles

 throughout the house. At the time that he “glanced in and passed by [Malachi’s

 body,]” Officer Kirkland “saw what appeared to [be] a doll or — it didn’t appear like

 a person on the floor . . . it didn’t appear like a boy to me.”

¶ 17 According to Officer Kirkland, Malachi appeared “small, skinny, and bony,”

 with his head seeming to be disproportionately large when compared to his body.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 Officer Kirkland testified that, despite the fact that Malachi was four years old and

 the fact that his clothes were sized for a 24-month old child, they were too baggy for

 his body. Officer Kirkland described Malachi as “laying on a pillow that was covered

 in numerous yellow stains and had a strong smell or odor of urine coming from the

 pillow.”

¶ 18 Detective James Brienza of the Gaston County Police Department, who also

 came to the Cheeks residence in the aftermath of Malachi’s death, stated that

 “Malachi didn’t look or appear to be real” and “almost looked doll like.” At the time

 that he interviewed defendant at the residence, Detective Brienza observed that

 defendant maintained an “emotionless” demeanor. In the course of his interview with

 Detective Brienza, defendant stated that he had fed Malachi earlier in the day and

 that Malachi had vomited before implying that Malachi’s genetic disorder had

 something to do with his death. A few days later, Detective Brienza interviewed

 defendant for a second time and noticed that there were several inconsistencies in

 the statements that defendant made on these two occasions. For example, Detective

 Brienza noticed that defendant claimed to have given different types of food to

 Malachi in these two interviews and made no mention of his earlier claim that

 Malachi had vomited in the second interview.

¶ 19 Angela Elder-Swift with the Gaston County Medical Examiner’s office

 examined Malachi’s body before it was removed from the Cheeks residence on 11 May

 2015. Ms. Swift “didn’t even notice the decedent laying in the middle [of the bedroom
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 floor] because [he] didn’t look real.” According to Ms. Elder-Swift, Malachi “looked

 like a doll laying on a pillow” and “almost looked plastic.” Ms. Elder-Swift testified

 that she “was able to see all of [Malachi’s ribs],” that Malachi’s “spine was showing”

 and “his skin was hanging off,” and that Malachi was “very cachectic.” In addition,

 Ms. Elder-Swift noticed that “[Malachi] had sores on places like pressure ulcers” and

 “pretty bad diaper sores.” Furthermore, Ms. Elder-Swift said that Malachi’s “eyes

 were very dry” and that “his mouth was extremely dry,” facts which, in Ms. Elder-

 Swift’s opinion, tended to suggest that Malachi was dehydrated. Upon removing

 Malachi’s diaper, Ms. Elder-Swift discovered “what looked to be some blood that

 transferred from [the] bad sores.” As best Ms. Elder-Swift could tell, no attempt had

 been made to perform cardio-pulmonary resuscitation upon Malachi.

¶ 20 On 12 May 2015, forensic pathologist Dr. Jonathon Privette performed an

 autopsy upon Malachi’s body. Malachi weighed only nineteen pounds at the time of

 his death even though an average four-year old male child would be expected to weigh

 thirty-eight to forty pounds. Dr. Privette testified that “most of [Malachi’s] organs

 seemed small for his age” and that “[d]ehydration could cause the organs to weigh

 less.” Dr. Privette determined that Malachi had very little subcutaneous body fat,

 resulting in “tenting” of the skin, a condition that exists when “you can take the skin

 and pinch it and pull it up and it retains that position when you release the skin” and

 which “is a clinical indication of dehydration.”
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

¶ 21 According to Dr. Privette, the sunken appearance of Malachi’s eyes stemmed

 from a lack of periorbital fat, which provided yet another indication of malnutrition

 and undernourishment. Dr. Privette found a “small amount of clear fluid with . . .

 scattered fragments of semi-solid white material consistent with dairy product” in

 Malachi’s stomach. In addition, Dr. Privette observed that Malachi had severe

 dermatitis on his buttocks and back, with this condition being attributable to diaper

 rash resulting from the fact that the child’s skin had been in contact with urine or

 feces for lengthy periods of time. According to Dr. Privette, Malachi’s diaper rash was

 so severe that he suffered from “skin slippage,” in which “the very superficial areas

 of the epidermis will basically slip away as you rub.”

¶ 22 As a result of the fact that Malachi’s body was in a state of isonatremic

 dehydration, Dr. Privette described Malachi’s dehydration as chronic and stated that

 it would have occurred over “more than a few days,” “probably weeks.” Upon

 detecting a scalp contusion and a subgaleal hemorrhage near Malachi’s forehead, Dr.

 Privette opined that these conditions would have resulted from either “an object

 hitting the skin or the skin hitting a stationary object,” with both of these injuries

 likely to have “happened very recently.” Finally, Dr. Privette noticed pressure ulcers

 on the inner portions of Malachi’s knees at the point where his knees would touch.

 Although he sought medical records relating to Malachi for the purpose of obtaining

 additional information that could be used in determining the cause of the child’s

 death, Dr. Privette was unable to locate any such records for 2014 or 2015. As a
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 result, Dr. Privette initially concluded that Malachi was a “debilitated male child

 with failure to thrive”; that “[t]here is the clinical appearance of malnutrition and

 dehydration including severe underweight, sunken eyes, absence of body fat, muscle

 atrophy, and severe skin tenting”; and that “[m]alnutrition/dehydration may be the

 immediate cause of death in this case and would represent neglect in the proper

 context.”

¶ 23 On 15 October 2015, Detective Brienza received Dr. Privette’s autopsy report.

 In reviewing that document, Detective Brienza identified several additional

 difficulties in the statements that defendant had made to him. As a result, Detective

 Brienza interviewed defendant for a third time on 30 October 2015, at which point

 defendant admitted to Detective Brienza that he had killed Malachi. During this

 interview, defendant provided two different accounts concerning the manner in which

 Malachi’s death had purportedly occurred. Initially, defendant told Detective

 Brienza that he had drowned Malachi in the bathtub. As their conversation

 progressed, however, defendant stated that he had “put his hands around Malachi’s

 throat to keep him quiet” because he “was frustrated with Malachi.” According to

 defendant, “he would put his hands around Malachi’s throat and pick him up by his

 neck and choke him enough to quiet him” and that, “[o]nce Malachi would become

 limp, he would physically throw him in the Pack N’ Play from a distance.” As a result,

 defendant claimed to have killed Malachi by choking him to death and described “how

 he watched Malachi take his last few gasps of breath of air of life.”
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

¶ 24 Dr. Privette read the transcript from the third interview that Detective

 Brienza had conducted with defendant and amended his autopsy report in light of the

 statements that defendant had made in that interview. In spite of the fact that there

 was no bruising to Malachi’s neck, Dr. Privette opined in his amended report that,

 “based on the fact that [Malachi] is very debilitated, isn’t going to be able to fight

 back, [and] isn’t going to be able to try and put an end to this pressure on the neck,”

 death by strangulation would be “totally consistent with [defendant’s] description of

 the events as to what happened” on the night of Malachi’s death. In addition, Dr.

 Privette stated that the description that defendant had given of Malachi’s last

 moments was consistent with agonal respiration and that defendant’s “explanation

 was spot on for what would [have] happen[ed].” Based upon defendant’s account of

 the manner in which Malachi died, Dr. Privette changed his conclusion concerning

 the cause of Malachi’s death from “failure to thrive” as the result of malnutrition and

 dehydration to strangulation, with “[n]utritional and medical neglect contibut[ing] to

 the death.”

¶ 25 On 16 November 2015, the Gaston County grand jury returned a bill of

 indictment charging defendant with first-degree murder. On 6 February 2017, the

 Gaston County grand jury returned bills of indictment charging defendant with child

 abuse inflicting serious bodily injury on the basis of an allegation that defendant had

 “plac[ed] his hands around Malachi Golden’s throat restricting air and blood flow

 resulting in Malachi Golden’s death” and negligent child abuse inflicting serious
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 bodily injury on the basis of an allegation that defendant had “show[ed] reckless

 disregard for human life by committing a grossly negligent omission . . . by not

 providing [Malachi] with medical treatment in over 1 year, despite the child having

 a disability, and further, not providing the child with proper nutrition and medicine

 resulting in weight loss and failure to thrive.” On 26 September 2017, defendant

 requested the trial court to conduct his trial while sitting without a jury. On 2

 October 2017, defendant filed a formal waiver of his right to a jury trial. After

 conducting a colloquy with defendant, the trial court granted defendant’s motion for

 bench trial on 4 October 2017.

¶ 26 The charges against defendant came on for trial before the trial court sitting

 without a jury at the 23 October criminal session of the Superior Court, Gaston

 County. At the close of the State’s evidence, defendant unsuccessfully moved to

 dismiss the charges that had been lodged against him for insufficiency of the

 evidence. While testifying in his own behalf, defendant made a number of statements

 that conflicted with those that he had made during his previous interviews with

 Detective Brienza, including assertions that he had fed Malachi several times on the

 day of his death. On cross examination, defendant testified that the explanations

 that he had given to Detective Brienza concerning the manner in which Malachi had

 died were “lie[s]”:

 Q. You gave vivid details. You had long dialogs about
 what you did to Malachi?
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 A. Yes, ma’am, but I did not do those things to my son.
 Q. You heard Dr. Privette say that you are spot on with
 your description of this choking, that that was
 exactly how it would look if a child was choked and
 you gave vivid details of that. You knew what it
 would look like?
 A. No, I didn’t, because I never choked anyone out.
 ....
 Q. You are saying that’s all a lie?
 A. Yes, ma’am.

 After denying that he had strangled Malachi, defendant expressed an inability to

 explain how the child had become so skinny or why Dr. Privette had found nothing

 in his stomach during the autopsy. At the close of all of the evidence, defendant

 unsuccessfully renewed his motion to dismiss for insufficiency of the evidence.

¶ 27 After conferring with the parties for the purpose of discussing the applicable

 law and the procedures that it would use in determining defendant’s guilt or

 innocence, the trial court developed a set of “jury instructions” that it would utilize

 in deciding the case, with those instructions including, over defendant’s objection, a

 consideration of the extent, if any, to which defendant was guilty of murder by

 starvation. See N.C.G.S. §14-17(a) (stating that “[a] murder which shall be

 perpetrated by means of . . . poison, lying in wait, imprisonment, starving, torture, or

 by any other kind of willful, deliberate, and premeditated killing . . . shall be deemed

 to be murder in the first degree”). In the course of developing these instructions, the

 trial court identified the following definitions of “starvation”:
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 Starvation is the result of a severe or total lack of nutrients
 needed for the maintenance of life.
 https://medicaldictionary.thefreedictionary.com/starvation
 To starve someone is to “kill with hunger;’ to be starved is
 to “perish from lack of food.” Starving: Medical Definition,
 Merriam-Webster Dictionary, http://www.merriam-
 webster.com/medical/starving (last visited Apr. 16, 2012).
 COMMENT: KinderLARDen Cop: Why States Must Stop
 Policing Parents of Obese Children. 42 Seton Hall L. Rev.
 1783. 1801
 To starve someone is the act of withholding of food, fluid,
 nutrition, Rodriguez v. State, 454 S.W. 3d 503, 505 (Tex.
 Crim. App. 2014)
 Starving can result from not only the deprivation of food,
 but also liquids. Deprivation of life-sustaining liquids
 amounts to starvation under the statute. A specific intent
 to kill is . . . irrelevant when the homicide is perpetrated by
 means [of] starving, or torture. State v. Evangelista, 319
 N.C. 152 (1987)
 When a homicide is perpetrated by means of poison, lying
 in wait, imprisonment, starving or torture, the means and
 method used involves planning and purpose. Hence, the
 law presumes premeditation and deliberation. The act
 speaks for itself. State v. Dunheen, 224 N.C. 738, 739
 (1944).
 After defendant’s trial counsel claimed to have “found almost the exact same thing”

 in his research, the trial court relied upon these definitions during its deliberations.

¶ 28 On 1 November 2017, the trial court entered an order in which it made the

 following findings of fact, among others:

 6. Malachi Golden died on May 11, 2015.
 ....
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

10. At the time of death, Malachi Golden had a plastic
 appearance with sunken eyes, protruding
 collarbones, protruding spine, protruding joints and
 protruding ribs.
11. At the time of death, Malachi Golden had very little
 body fat or muscle tissue.
 ....
15. The autopsy revealed that Malachi Golden was
 malnourished and dehydrated.
16. At the time of death, Malachi Golden weighed 19
 pounds compared to the average weight of a 38-40
 pounds for a four-year-old boy.
 ....
18. At the time of death, Malachi Golden had a very
 wasted appearance.
 ....
20. Malachi Golden suffered from acute diaper rash
 with extensive inflammation on his buttocks and
 groin.
 ....
22. Malachi Golden suffered from acute diaper rash for
 an extended period without treatment.
 ....
36. The caregivers ceased all medication, medical care
 and therapy sessions without consulting Malachi
 Golden’s physicians.
37. For the last few months of his life, Malachi Golden
 was cloistered from all adults except Tiffany Cheeks
 and Defendant.
38. During this period, Defendant became the primary
 caregiver for Malachi Golden and provided up to 80
 percent of the child’s care.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 ....
 49. Both Defendant and Ms. Tiffany Cheeks recanted
 their interviews with the police where they admitted
 wrongdoing regarding the care of Malachi Golden.
 50. Defendant contradicted himself several times on the
 stand during his testimony during the trial.
Based upon these findings of fact, the trial court concluded as a matter of law that:

 7. Defendant committed a grossly wanton and negligent
 omission with reckless disregard for the safety of
 Malachi Golden by:
 a. Allowing [Malachi] to remain in soiled diapers
 until acute diaper rash formed on the groin and
 bottom of Malachi Golden which included open
 sores and ulcers; and
 b. Keeping [Malachi] in a playpen for so long of
 period that bed sores formed on Malachi
 Golden’s legs and knees.
 8. The above sub-paragraphs caused the child extreme
 pain and with reckless disregard for human life.
 9. To starve someone is to “kill with hunger.”
 10. A reasonably careful and prudent person could foresee
 that failing to provide a child’s nutritional needs
 would cause death.
 11. By feeding Malachi Golden typically only once a day
 and watching the child waste away to skin and bones,
 the Defendant intentionally starved the four-year-old
 boy.
 12. Malachi Golden perished from the lack of food and life-
 sustaining liquids.
 13. Defendant’s starving Malachi Golden was the
 proximate cause of the child’s death.
 14. Defendant’s failure to take any action to seek medical
 help, through any means possible, for Malachi Golden
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 as the child wasted away from lack of nutrients
 needed for the maintenance of life was the commission
 of a homicide.
 Based upon these findings of fact and conclusions of law, the trial court found

 defendant guilty of first-degree murder on the basis of starvation and negligent child

 abuse inflicting serious bodily injury while refusing to find defendant guilty of first-

 degree murder on the basis of malice, premeditation, and deliberation, torture, or the

 felony murder-rule using child abuse inflicting serious bodily injury as the predicate

 felony and child abuse inflicting serious bodily injury.2 After making these

 determinations, the trial court consolidated defendant’s convictions for judgment and

 entered a judgment sentencing defendant to a term of life imprisonment without the

 possibility of parole. Defendant noted an appeal from the trial court’s judgment to

 the Court of Appeals.

¶ 29 In seeking to persuade the Court of Appeals to overturn the trial court’s

 judgment, defendant argued, among other things, that (1) the trial court had erred

 by denying his motion to dismiss for insufficiency of the evidence on the grounds that

 the record did not suffice to support defendant’s conviction for first-degree murder on

 2 The parties have not argued that the trial court erred by adopting the procedures

 that it utilized to decide this case. Although we are inclined to agree with the Court of
 Appeals that there was no necessity for the trial court to have instructed itself concerning
 the applicable law or to enter an order containing findings of fact and conclusions of law,
 State v. Cheeks, 267 N.C. App. 579, 595 (2019), we do not believe that the trial court erred by
 proceeding as it did and will evaluate defendant’s challenges to the trial court’s judgment
 utilizing the approach that the trial court elected to adopt in deciding the relatively novel
 issues that were before it in this case.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 the basis of starvation; (2) the trial court had committed plain error and had erred by

 failing to instruct itself that malice was an essential element of first-degree murder

 on the basis of starvation and by failing to make a separate determination that

 defendant had acted with malice; and (3) that the trial court had erred by convicting

 defendant of negligent child abuse inflicting serious injury based upon a theory that

 defendant had allowed Malachi to develop sores and pressure ulcers in spite of the

 fact that the indictment that had been returned against defendant for the purpose of

 charging him with that offense did not support such a determination. State v. Cheeks,

 267 N.C. App. 579, 599, 602, 605–06, 610 (2019).

¶ 30 In rejecting these contentions, the Court of Appeals began by noting that no

 reported decision by either this Court or the Court of Appeals had directly addressed

 the issue of a convicted criminal defendant’s guilt of first-degree murder on the basis

 of starvation and that neither N.C.G.S. § 14-17(a) nor our appellate jurisprudence

 defined the term “starv[ation]” for purposes of that statutory provision. Cheeks, 267

 N.C. App. at 599–600. Based upon this Court’s decision in State v. Evangelista, 319

 N.C. 152 (1987), the Court of Appeals determined that “starving” can be defined as

 “death from the deprivation of liquids or food ‘necessary in the nourishment of the

 human body,’ ” Cheeks, 267 N.C. at 602 (quoting Evangelista, 319 N.C. at 158), while

 rejecting defendant’s contention that murder by starvation requires the complete

 denial of all food or water, or both, for a certain period of time, concluding that “[t]he

 deprivation need not be absolute and continuous for a particular time period.” Id.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

¶ 31 In addition, the Court of Appeals held that the record contained sufficient

 evidence to support a determination that starvation proximately caused Malachi’s

 death. Id. at 610. In spite of the fact that Dr. Privette’s amended written report and

 his trial testimony stated that the findings that he had made during the autopsy that

 he performed upon Malachi’s body could be consistent with strangulation, the Court

 of Appeals noted that the only direct evidence that Malachi died as the result of

 strangulation stemmed from the statement that defendant gave to Detective Brienza,

 an account that defendant had repudiated at trial and which the trial court found to

 lack credibility. Id. at 608–09. In addition, the Court of Appeals pointed out that Dr.

 Privette had testified that, in the absence of defendant’s claim to have strangled

 Malachi, he would not have amended his initial autopsy report, which concluded that

 malnutrition and dehydration were the immediate causes of Malachi’s death. Id.

 According to the Court of Appeals, the trial court acted well within its authority as

 the trier of fact in rejecting defendant’s extra-judicial claim to have strangled Malachi

 and the related cause of death determination set out in Dr. Privette’s amended report.

 Id. at 609. As a result, given the absence of any additional evidence tending to show

 that Malachi died as the result of strangulation, the Court of Appeals concluded that

 there was ample evidence to support a determination that Malachi’s death was the

 proximate result of the deprivation of food and water at a time when defendant was

 his primary caregiver. Id.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

¶ 32 Secondly, the Court of Appeals determined that this Court “has clearly held

 that no separate showing of malice is required for first degree murder by the means

 set forth” in N.C.G.S. § 14-17(a). Id. at 605 (citing State v. Smith, 351 N.C. 251, 267

 (2000)). For that reason, the Court of Appeals concluded that, “[j]ust as with

 poisoning or torture, murder by starving ‘implies the requisite malice, and a separate

 showing of malice is not necessary.’ ” Id. at 606 (quoting Smith, 351 N.C. at 267). As

 a result, the Court of Appeals held that “the trial court did not err by not making a

 finding or conclusion as to malice.” Id.

¶ 33 Finally, the Court of Appeals held that the trial court did not err by convicting

 defendant of negligent child abuse inflicting serious bodily injury on the basis of a

 factual theory that had not been alleged in the indictment on the grounds that the

 indictment that had been returned against defendant for the purpose of charging him

 with negligent child abuse alleged all of the essential elements of that offense and

 that the more specific factual allegations contained in the indictment constituted

 nothing more than mere surplusage. Id. at 614. For that reason, the Court of Appeals

 rejected defendant’s contention that there was a fatal variance between the

 indictment and the theory of guilt upon which the trial court’s instructions and

 findings and conclusions rested. Id. Moreover, given the fact that the indictment

 that had been returned for the purpose of charging defendant with negligent child

 abuse inflicting serious injury alleged that defendant had failed to “provid[e] the child

 with medical treatment in over one year despite having a disability,” the Court of
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 Appeals determined that the allegations set out in the indictment were supported by

 the evidence that Malachi was suffering from severe diaper rash at the time of his

 death and the evidence that Malachi had not seen a physician during the last year of

 his life. Id. On 1 April 2020, this Court allowed defendant’s request for discretionary

 review of the Court of Appeals’ decision in this case.

¶ 34 In seeking to persuade us to overturn the Court of Appeals’ decision, defendant

 argues that the trial court erred by failing to dismiss the first-degree murder charge

 that had been lodged against him on the grounds that the record failed to contain

 sufficient evidence to support a finding that Malachi’s death was proximately caused

 by starvation. In support of this contention, defendant asserts that Dr. Privette’s

 testimony provided the only expert testimony concerning the cause of Malachi’s death

 and that Dr. Privette had unequivocally testified that Malachi had died as the result

 of asphyxia secondary to strangulation. Defendant claims that, “[a]lthough the Court

 of Appeals was correct that the trial court was free to reject Dr. Privette’s opinion

 that Malachi died of strangulation,” “it does not necessarily follow that the trial court

 could rely on Dr. Privette’s previous opinion, even if that opinion really had been that

 Malachi died of starvation.” In defendant’s view, expert testimony was necessary to

 establish the cause of Malachi’s death given that the cause of Malachi’s death would

 not have been reasonably apparent to a lay juror. Defendant reasons that,

 “[a]lthough several of [Dr. Privette’s] findings note that Malachi was malnourished

 and dehydrated at the time of his death, none of these findings relate to cause of
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 death,” with “Malachi’s emaciated and dehydrated condition as depicted in the

 pictures [being insufficient to] explain why Malachi was alive on May 10, 2015 but

 dead on May 11, 2015.” As a result, defendant argues that, “because there was no

 other expert testimony to support any other cause of death, and because expert

 testimony was necessary to establish the cause of Malachi’s death, the evidence was

 insufficient to support the trial court’s verdict that Mr. Cheeks was guilty of murder

 by starvation.”

¶ 35 Secondly, defendant argues that, in light of the manner in which murder and

 manslaughter are defined at common law, the State was required to make a separate

 showing of malice in order to prove defendant’s guilt of murder on the basis of

 starvation. In support of this argument, defendant asserts that N.C.G.S. § 14-17(a)

 did not abrogate the common law requirement that proof of malice was necessary to

 sustain a murder conviction. As a result, defendant contends that the trial court

 committed plain error by failing to instruct itself that malice is a necessary

 prerequisite for a conviction of first-degree murder based upon a theory of starvation

 and erred by failing to make a specific finding that defendant acted with malice.

¶ 36 In the alternative, defendant argues that, if malice is deemed to be implied in

 the event of a murder by starvation in a manner similar to the way in which malice

 has been deemed to be implied in connection with the other forms of murder specified

 in N.C.G.S. § 14-17(a), see, e.g., Smith, 351 N.C. at 267 (holding that malice is implied

 through the act of killing another by torture or poison), then “starving” must be
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 defined narrowly in order to ensure that only malicious homicides are punished as

 first-degree murder. In defendant’s view, this Court held that malice was implied in

 murders by torture and poisoning because such killings require “intentional infliction

 of grievous pain and suffering.” Smith, 351 N.C. at 267. In order to ensure

 consistency between murders by torture and poisoning, on the one hand, and murder

 by starvation, on the other, defendant asserts that it is necessary that “starving” be

 defined as involving a complete deprivation of food and water, with this Court having

 adopted such a definition in dicta in State v. Evangelista, 319 N.C. 152, 158 (1987)

 (affirming a first-degree murder based upon premeditation and deliberation in a case

 in which the defendant held others, including an infant, hostage while denying them

 food or water, resulting in the infant’s death, and stating that, in addition, the record

 evidence would have supported a first-degree murder conviction on the basis of a

 theory of starvation). According to defendant, since the common law did not view the

 “act of allowing a child to die of malnutrition” as “inherently malicious” and since the

 enactment of N.C.G.S. § 14-17(a) “did not change the common law definition of

 murder,” this Court should either require the State to make a separate showing of

 malice or define starvation in the narrowest possible manner.

¶ 37 Finally, defendant contends that his conviction for negligent child abuse

 inflicting serious bodily injury rested upon findings that Malachi suffered from

 bedsores, pressure ulcers, and diaper rash while the indictment alleged that

 defendant’s guilt rested upon a failure to provide Malachi with medical treatment
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 and proper nutrition. In defendant’s view, the alleged discrepancy between the basis

 for the claim of serious bodily injury alleged in the indictment and the injuries

 depicted in the trial court’s findings resulted in a conviction that rested upon “a

 theory not charged in the indictment [that] constitutes reversible error,” with the

 Court of Appeals having erred by relying upon its own earlier decision in State v.

 Qualls, 130 N.C. App. 1, 8 (1998) (holding that “if an indictment contains an averment

 which is not necessary in charging the offense, it may be disregarded as

 inconsequential”), which defendant contends to be in conflict with prior decisions of

 this Court, and by holding that the factual allegations set out in the indictment

 charging defendant with negligent child abuse inflicting serious injury were nothing

 more than “mere surplusage.”

¶ 38 The State, on the other hand, argues that the record contains ample evidence

 tending to show that Malachi’s death was proximately caused by starvation. In the

 State’s view, the evidence of starvation in this case was “extreme and obvious” and

 that, by doing nothing more than “viewing the condition of Malachi’s body, any person

 of average intelligence would be able to determine, at a minimum, that starvation

 substantially contributed to his death.” In addition, the State asserts that the

 testimony of Dr. Privette coupled with the circumstances surrounding the changes

 that he made to his autopsy report provided any necessary expert support for the trial

 court’s cause of death determination. In view of the fact that the trial court expressly

 found as a fact that defendant’s testimony conflicted with the admissions that he had
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 made at an earlier time, the State contends the trial court had ample justification for

 deciding that defendant was not a credible witness, with the same being true of any

 expert opinion testimony predicated upon defendant’s prior statements to Detective

 Brienza.

¶ 39 Secondly, the State argues that malice is implied in connection with the

 specific means of killing that are treated as first-degree murder in N.C.G.S. § 14-17(a)

 given defendant’s “willful intent to withhold life sustaining food and water, rather

 than mere negligence.” In support of this contention, the State directs our attention

 to State v. Dunheen, 224 N.C. 738 (1944), which it describes as holding that, “where

 the murder is perpetrated by means of poison, lying in wait, imprisonment, starving,

 or torture, the means and method used involve planning and purpose, and the act

 speaks for itself.” Id. at 740. In view of the fact that the sufficiency of the evidence

 to support a conviction for first-degree murder by starvation is a matter of first

 impression in North Carolina, the State identifies decisions from a number of other

 jurisdictions which hold that the commission of such a murder inherently involves

 malice given that the length of time needed to starve someone to death shows

 “coldness and deliberation, for within that time there was ample opportunity for

 reflection.” See, e.g., Commonwealth v. Tharp, 574 Pa. 2d 272 (2002). As a result,

 the State asserts that the operative distinction between conduct that constitutes

 murder and conduct that constitutes manslaughter hinges upon whether the

 defendant did or did not act willfully.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

¶ 40 In addition, the State responds to defendant’s contention that starvation for

 purposes of N.C.G.S. § 14-17(a) should be limited to situations involving the complete

 deprivation of food and water by arguing that the adoption of such a definition would

 unduly restrict the types of conduct that would be deemed to constitute first-degree

 murder for purposes of N.C.G.S. § 14-17(a). More specifically, the State contends that

 the adoption of “defendant’s argument would lead to the illogical result that giving a

 victim a drop of food or water each day would shield a defendant from a charge of

 first-degree murder by starvation in North Carolina,” with there being no reported

 decision of any court holding that the viability of a “charge of murder was dependent

 upon a complete deprivation of food and water as a matter of law.” On the contrary,

 the State asserts that numerous decisions from other jurisdictions hold that evidence

 tending to show that defendants who starved victims over a prolonged period of time

 could appropriately be convicted of murder even though they occasionally provided

 food to their victims.

¶ 41 Finally, the State denies that there was a fatal variance between the

 allegations of the indictment charging defendant with negligent child abuse inflicting

 serious bodily injury and the evidence upon which the trial court relied in convicting

 defendant of that offense. According to the State, the Court of Appeals correctly held

 that the factual allegations set out in the negligent child abuse indictment constituted

 mere surplusage in light of several decisions by this Court which, in the State’s view,

 hold that an indictment need only allege the essential elements of the crime that the
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 grand jury was attempting to charge and that any factual allegations above and

 beyond the elements of the offense have no bearing upon the validity of the

 defendant’s conviction. In addition, the State argues that Qualls had not been

 overruled by the cases upon which defendant relies given that they involve

 allegations that specified the legal theory upon which the State relied in seeking to

 convict defendant rather than mere recitations of non-essential factual information.

 See, e.g., State v. Silas, 360 N.C. 377, 379 (2006) (finding the existence of a fatal

 variance when the State’s evidence did not tend to show that the defendant intended

 to commit the felony enumerated in the indictment charging the defendant with

 burglary). The State also argues that, even if the factual allegations upon which

 defendant’s argument relies were not mere surplusage, those allegations support the

 theory of guilt embodied in the trial court’s conclusions given that the indictment

 alleged both malnutrition and failure to provide medical care while the record

 evidence tending to show that Malachi suffered from diaper rash, bedsores, and

 pressure ulcers sufficed to support a determination that defendant was negligent in

 failing to “provid[e] the child with medical treatment” causing serious bodily injury.

¶ 42 This Court reviews the sufficiency of the evidence to support a criminal

 conviction by evaluating “whether there is substantial evidence of each essential

 element of the offense charged, or of a lesser included offense of that charged.” State

 v. Workman, 309 N.C. 594, 598 (1983). “The evidence is to be considered in the light

 most favorable to the State,” with the State being “entitled to . . . every reasonable
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 inference to be drawn therefrom” and with any “contradictions and discrepancies

 [being left] for the jury to resolve . . . .” Id. at 598–99 (quoting State v. Powell, 299

 N.C. 95, 99 (1980)). In the event that the record contains sufficient evidence,

 “whether direct, circumstantial, or both,” “to support a finding that the offense

 charged has been committed and that the defendant committed it, the case is for the

 jury.” State v. King, 343 N.C. 29, 36 (1996) (quoting State v. Locklear, 322 N.C. 349,

 358 (1988)).

¶ 43 According to well-established North Carolina law, a conviction for an unlawful

 homicide requires sufficient evidence that a defendant’s unlawful act proximately

 caused the victim’s death. State v. Minton, 234 N.C. 716, 721 (1952). Although expert

 medical testimony is needed to support the making of the necessary proximate cause

 determination in instances in which an average layman is unable to determine the

 cause of death, such evidence is not necessary when a “person of average intelligence

 would know from his own experience or knowledge that the wound was mortal in

 character” given that “the law is realistic when it fashions rules of evidence for use

 in the search for truth.” Id.

¶ 44 A careful review of the record evidence satisfies us that the trial court had

 ample justification for concluding that Malachi died as a proximate result of

 starvation. According to testimony provided by a number of persons responsible for

 providing him and his sibling with various forms of treatment during the last two

 years of his life, Malachi was not fed even though he was ravenously hungry and
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 looking considerably thinner in the months leading up to his death. Similarly, the

 emergency medical technicians who responded to Ms. Cheeks’ call in the aftermath

 of Malachi’s death noticed the malnourished state of Malachi’s body, which some of

 them initially mistook for a doll. In addition, the physical evidence set out in Dr.

 Privette’s autopsy report unequivocally demonstrates that Malachi was severely

 malnourished and dehydrated.

¶ 45 Moreover, the record provides ample expert support for a determination that

 Malachi died of starvation.3 According to Dr. Robinette, the only thing that “would

 cause Malachi or any child to look like” the child described by the emergency medical

 technicians and depicted in the autopsy report and related photographs was

 “starvation.” Although Dr. Privette’s amended report attributed Malachi’s death to

 asphyxia secondary to strangulation, the record clearly demonstrates that his opinion

 to that effect rested solely upon the information that defendant provided in his final

 interview with Detective Brienza. In light of the fact that Dr. Privette made no

 physical findings in support of the cause of death determination set out in his

 amended report and the fact that the record provided more than sufficient support

 for a determination that defendant’s claim to have strangled Malachi lacked

 credibility, we have no difficulty in concluding that the trial court had ample

 3 For this reason, we need not determine whether defendant or the State has the better

 of the dispute over the extent to which expert testimony concerning the cause of death was
 necessary in this case.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 justification for rejecting any contention that Malachi died from strangulation. See

 State v. Morganherring, 350 N.C. 701, 729 (1999) (holding that, in the event that an

 expert witness gives testimony regarding the cause of a victim’s death, the degree of

 “familiarity with the sources upon which he based his opinion is certainly relevant as

 to the weight and credibility the jury should give to [the testimony]”). Furthermore,

 in light of the fact that Dr. Privette’s initial autopsy report appears to have been

 admitted into evidence without being subject to any limitation, we know of no reason

 why the trial court was not entitled to rely upon Dr. Privette’s initial conclusion that

 “[m]alnutrition may be the immediate cause of death in this case,” particularly given

 the fact that Dr. Privette returned to the theme of starvation in his amended report

 by stating that “nutritional and medical neglect contributed to this death” in his

 amended report.4 As a result, for all of these reasons, the record contained more than

 sufficient support for the trial court’s determination that Malachi died as a proximate

 result of starvation.

¶ 46 Similarly, we conclude that the trial court did not commit plain error or err by

 failing to instruct itself concerning the issue of malice or to make a separate finding

 4 Although defendant emphasizes the fact that Dr. Privette’s initial report used the

 word “may” in attributing Malachi’s death to malnutrition and dehydration in arguing that
 that testimony failed to satisfy the evidentiary principle set out in Holley v. ACTS, Inc., 357
 N.C. 228, 233 (2003) (stating that “expert testimony as to the possible cause of a medical
 condition is admissible,” “it is insufficient to prove causation”), we conclude that defendant’s
 argument lacks merit given that, when read it its entirety, it is clear that Dr. Privette’s report
 indicates that malnutrition and dehydration probably contributed to Malachi’s death.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 that defendant acted with malice in connection with the killing of Malachi. As this

 Court has previously held, the act of torture is indistinguishable from the act of

 poisoning for purposes of the specifically enumerated types of killings set out in

 N.C.G.S. § 14-17(a), Smith, 351 N.C. at 267, with torture and poisoning both

 constituting wanton acts that are necessarily conducted “in such a manner as to

 manifest depravity of mind, a heart devoid of a sense of social duty, and a callous

 disregard for human life.” Id. (quoting State v. Crawford, 329 N.C. 466, 481 (1991)).

 As a result, the showing of malice necessary for guilt of murder is inherent in the act

 of fatally torturing or poisoning another human being. Id.

¶ 47 As is the case with acts of torture or poisoning resulting in the death of another

 person, the intentional withholding of the nourishment and hydration needed for

 survival resulting in the death of that other person at a time when the person in

 question is unable to provide these things for himself or herself shows a reckless

 disregard for human life and a heart devoid of social duty. See State v. Wilkerson,

 295 N.C. 559, 916 (1978) (stating that, if “an act of culpable negligence . . . ‘is done so

 recklessly or wantonly as to manifest depravity of mind and disregard of human life,’

 it will support a conviction for second degree murder”) (quoting State v. Wrenn, 279

 N.C. 674, 687 (1971) (Sharp, J., dissenting)). Put another way, the act of starving

 another person to death takes time, during which the defendant has ample

 opportunity to reflect upon his or her conduct, to take mercy upon the victim, and to

 be increasingly aware of the other person’s condition, with a decision to intentionally
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 deprive another person of needed nutrition and hydration resulting in death being,

 under such circumstances, inherently malicious as a matter of law. Thus, the malice

 necessary for guilt of murder is inherent in the intentional withholding of hydration

 or nutrition sufficient to cause death. As a result, we hold that the act of starving

 another person to death for purposes of N.C.G.S. § 14-17(a), without more, suffices to

 show malice, so that the trial court did not commit plain error by failing to instruct

 itself to make a separate finding of malice or err by failing to make a separate

 determination that defendant acted maliciously in its findings of fact and conclusions

 of law.5

¶ 48 The record contains testimony from multiple witnesses tending to show that

 food was present in the Cheek residence and that Malachi’s siblings received

 sufficient nutrition and hydration to survive. Although the evidence clearly depicts

 Malachi as hungry and dehydrated during the months leading to his death, defendant

 made no effort to seek medical attention for Malachi during that period of time and,

 at most, fed Malachi only once each day despite the fact that he served as Malachi’s

 primary caretaker for a great deal of the time. For that reason, we further hold that

 the record and the trial court’s findings contain ample evidence tending to show that

 defendant proximately caused Malachi’s death by intentionally depriving him of

 5 In view of the fact that there is not and never has been a requirement that the trial

 court or jury make a separate finding of malice in order to convict a defendant of first-degree
 murder on the basis of starvation pursuant to N.C.G.S. § 14-17(a), our decision does not
 subject defendant to impermissible punishment on the basis of an ex post facto law.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 needed hydration and nutrition, a showing that amply supports the trial court’s

 decision to convict defendant of murder by starvation pursuant to N.C.G.S. § 14-17(a).

¶ 49 In addition, we are unable to accept defendant’s contention that starvation for

 purposes of N.C.G.S. § 14-17(a) should be understood to require proof that the

 defendant subjected the alleged victim to a complete deprivation of food and

 hydration. Aside from the fact the language from our decision in Evangelista upon

 which defendant relies is dicta, nothing in the related discussion in any way suggests

 that a complete deprivation of nutrition and hydration is necessary for guilt of first-

 degree murder on the basis of starvation pursuant to N.C.G.S. § 14-17(a). Instead,

 that discussion simply indicates that murder by starvation occurs in the event that

 the defendant completely deprives the victim of food and drink, a statement that is

 self-evidently true. In the same vein, nothing in State v. Fritsch, 351 N.C. 373 (2000),

 upon which defendant also relies, makes the difference between guilt of murder or

 manslaughter contingent upon the amount of nutrition or hydration that the alleged

 victim failed to receive. Finally, the adoption of defendant’s definition of starvation

 for purposes of N.C.G.S. § 14-17(a) would produce what strikes us as an absurd result

 in certain cases, see Mazda Motors of Am., Inc. v. Southwestern Motors, Inc., 296 N.C.

 357, 361 (1979) (quoting State v. Barksdale, 181 N.C. 621, 250, 253 (1921)), given

 that, under defendant’s definition, a person who kills someone else by withholding

 virtually all, but not all, food and drink would not be guilty of murder by starvation.

 As a result, we reject defendant’s contention that murder by starvation pursuant to
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

 N.C.G.S. § 14-17(a) is limited to situations involving the complete deprivation of

 hydration and nutrition.

¶ 50 Finally, we hold that defendant’s contention that there is a fatal discrepancy

 between the allegations of the indictment charging defendant with negligent child

 abuse inflicting serious injury and the trial court’s factual justification for convicting

 defendant of that offense lacks merit.6 As we have already noted, the indictment

 charging defendant with negligent child abuse inflicting serious injury alleges that

 defendant failed to provide Malachi “with medical treatment” for over one year,

 “despite the child having a disability,” and with failing to “provid[e] the child with

 proper nutrition and medicine, resulting in weight loss and failure to thrive.” In our

 opinion, the trial court’s determinations that defendant “allow[ed] the child to remain

 in soiled diapers until acute diaper rash formed on the [child’s] groin and bottom,”

 resulting in “open sores and ulcers,” and that defendant kept “the child in a playpen

 for so long a period of time that bed sores formed on [his] legs and knees” are fully

 consistent with the grand jury’s allegations that defendant deprived Malachi of

 medical treatment, resulting in the infliction of serious bodily injury. As a result, we

 hold that the trial court’s findings and the relevant allegations of the indictment are

 6 In view of our determination that the trial court’s findings do, in fact, support the

 theory of guilt alleged in the indictment, we need not determine whether the Court of Appeals
 correctly concluded that the factual allegations set out in the indictment are or are not mere
 surplusage or whether defendant properly preserved this claim for purposes of appellate
 review and express no opinion concerning the manner in which either of these issues should
 be decided.
 STATE V. CHEEKS

 2021-NCSC-69

 Opinion of the Court

fully consistent with each other. As a result, for all of these reasons, the Court of

Appeals decision should be affirmed.

 AFFIRMED.